<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF OKLAHOMA**

**Filed / Docketed**
**May 15, 2007**

IN RE:

MV PIPELINE COMPANY,

            **Debtor.**

**Case No. 07-80214-R**
**Chapter 11**

<u>**MEMORANDUM OPINION**</u>

Before the Court is the Motion to Dismiss Chapter 11 Petition Pursuant to 11 U.S.C.

§ 1112(b) as a Bad Faith Filing with Supporting Brief and Request for Evidentiary Hearing

(Doc. 39) (the "Motion") filed by Gary Moores ("Moores") and G.M. Oil Properties, Inc.

("GM Oil") (collectively the "Movants") on March 26, 2007, and the Objection to Motion

to Dismiss Chapter 11 Petition Pursuant to 11 U.S.C. § 1112(b) as a Bad Faith Filing with

Supporting Brief and Request for Evidentiary Hearing (Doc. 63) (the "Objection") filed by

the Debtor in Possession, MV Pipeline Company ("MV Pipeline"), on April 18, 2007.  An

evidentiary hearing was held on April 20, 2007, and April 23, 2007.  On May 7, 2007, in

compliance with 11 U.S.C. § 1112(b)(3), which requires the Court to "decide the motion [to

dismiss or convert] not later than 15 days after commencement of [the] hearing" on such a

motion, the Court entered its Order Denying Motion to Dismiss and advised that this

Memorandum Opinion containing its detailed findings of fact and conclusions of law would

be entered.

Upon consideration of the pleadings and briefs, the testimony and documentary

evidence presented at the hearing, the arguments of counsel, and applicable law, the Court

finds and concludes as follows:

## I.        Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(A); and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.       Findings of fact

On March 8, 2007, MV Pipeline filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").  Voluntary Petition, Movant Exhibit N. MV Pipeline owns a natural gas gathering system that gathers and transports natural gas produced in Haskell, McIntosh and Pittsburg Counties, Oklahoma, from the wellhead to the point it is conveyed to a gas purchaser.  The pipeline consists of approximately 40 miles of pipe and gathers gas from approximately 80-90 gas wells.

### Ownership of MV Pipeline and the Crouch and Diamond Leases

After extensive litigation in Pittsburg County, Oklahoma (the "Pittsburg County Litigation"), concerning the ownership of certain leases in McIntosh County as well as the ownership of MV Pipeline, on April 21, 2003, the Pittsburg County court determined that MV Pipeline was owned by Gene Stipe ("Stipe"), Eddie Harper ("Harper") and Moores/GM Oil[1] in equal shares.  Journal Entry of Judgment, MV Exhibit 22.  Thereafter, Moores

_____

[1]For the purpose of determining the ownership of the leases and MV Pipeline, the Pittsburg County court treated Moores and GM Oil as one entity.  At the time the Pittsburg County court issued its decision, Moores owned 100% of GM Oil's stock.  In 2005, Moores sold his interest in GM Oil to a consortium of investors.  The investors subsequently granted Moores a 40% interest in GM Oil in return for his commitment to continue as GM Oil's president and general manager.   GM Oil explores, drills, produces and operates the wells owned by Stipe, Harper and Moores/GM Oil that are connected to the MV Pipeline system, as well as other properties.

Case 07-80214    Doc 79    Filed 05/15/07    Entered 05/15/07 17:15:52    Desc Main
Document      Page 2 of 33

transferred whatever interest he had in MV Pipeline to GM Oil. Thus, on the Petition Date, Stipe, Harper and GM Oil each owned one-third of MV Pipeline's stock.[2] The Pittsburg County court also determined that the so-called Crouch leases were held in a joint venture in which Stipe, Harper and Moores/GM Oil each owned an equal share, and that the so-called Diamond leases were held in a joint venture in which Moores/GM Oil owned sixty percent, Stipe owned twenty percent, and Harper owned twenty percent.

The Pittsburg County court ordered "a full and complete accounting of these interests" and appointed a special master to determine and equalize the parties' respective contributions to the joint ventures. Journal Entry of Judgment, MV Exhibit 22. Among other things, the Special Master calculated the value of Moores/GM Oil's contribution of services and advances to the joint ventures, and calculated the amount Stipe and Harper owed Moores/GM Oil. Report of Accounting Special Master ("Special Master's Report"), Exhibit C to Plaintiff's First Amended Petition (Case CJ-2006-242), MV Exhibit 25.[3] Stipe and Harper paid Moores/GM Oil the sums determined by the Special Master, and Moores/GM Oil executed assignments to Stipe and Harper to reflect their adjudicated interests in the Crouch

---

[2]The Court finds that notice of the Motion and hearing on the Motion was given to all parties entitled to notice pursuant to Bankruptcy Rule 2002.

[3]The Special Master's Report appears to be limited to an adjustment of the individual parties' accounts in the Crouch and Diamond joint ventures, and appears to exclude any attempt to determine whether MV Pipeline is indebted to any of the individual parties for services rendered to or advances made to MV Pipeline, or whether any individual party owes any other individual in connection with acquisition of the stock of MV Pipeline. At this time, however, it is unnecessary to determine the scope of the Special Master's accounting or the scope of issues actually decided in the Pittsburg County Litigation, other than its determination of ownership of the Crouch and Diamond leases and of MV Pipeline.

and Diamond leases, thus dissolving the joint ventures.  Assignments, Exhibit A to Plaintiff's First Amended Petition (Case CJ-2006-242), MV Exhibit 25.

**Pittsburg County Litigation**

The Pittsburg County Litigation was commenced by Stipe and Harper against Moores, GM Oil, MV Pipeline and others in November 2001, and remains pending.  Docket Sheet, Pittsburg County Case No. 2001-01484, Movant Exhibit A.  As set forth above, in April 2003, the Pittsburg County court determined the relative rights and interests of Stipe, Harper and Moores/GM Oil in the joint ventures that owned the leases and the ownership of the MV Pipeline stock.  Id.  In June 2003, the Pittsburg County court denied Stipe and Harper's request for a receiver, finding "there is no emergency existing jeopardizing the assets." Id.[4] In September 2004, the Special Master issued his report, and in November 2004, the Pittsburg County court adopted the Special Master's Report in full and ordered the dissolution of the joint ventures.  In February 2005, Stipe and Harper sought a citation for contempt against Moores and GM Oil (the nature of the alleged contempt is not evident from the docket entry).  Id.  A citation was issued in October 2005, and that matter was set for trial on May 11, 2007.  Id.

**The Involuntary Chapter 11**

On May 16, 2005, Stipe and Harper gave notice of a special meeting of MV Pipeline's shareholders, to be held on May 30, 2005, "[t]o review the books, records and past performance of the company"; "to nominate and elect the members of the Board of Directors

---

[4]From the docket sheet, the Court is unable to discern whether Stipe and Harper sought a receiver to operate the joint venture leases or MV Pipeline or both.

4

of the Company"; and "such other business as may properly come before the meeting." Notice of Special Meeting of Shareholders of M.V. Pipeline Company, MV Exhibit 23. The notice was served on Moores on May 17, 2005. Id.

On May 25, 2005, Moores, GM Oil, and Concorde Resources Corporation ("Concorde") (an entity wholly owned by Moores) (collectively, Petitioning Creditors") filed an involuntary bankruptcy petition against MV Pipeline in the United States Bankruptcy Court for the Eastern District of Oklahoma, Case No. 05-72206 (the "Involuntary Case"). Docket Sheet, Movant Exhibit C. Contemporaneously with the filing of the involuntary petition, GM Oil filed an Emergency Motion for Order Appointing Trustee and an Application for Expedited Hearing on Emergency Motion for Order Appointing Trustee and for Order Reducing Response Time and to Shorten Notice ("Application for Expedited Hearing") Id. The Involuntary Case was assigned to Judge Terrence Michael.

On May 26, 2005, Judge Michael entered an order denying the Application for Expedited Hearing, in which he recited the following facts:

> The principal facts alleged in the Motion and Application are that Moores is one of three shareholders of the Alleged Debtor, each of which owns one-third of the stock in the Alleged Debtor. GM currently operates and acts as the manager of the Alleged Debtor. Apparently there is a significant level of discord between Moores and the other two shareholders. GM alleges that a shareholder meeting is scheduled for May 30, 2005, and the relief requested is necessary to prevent that meeting from taking place. Apparently GM is concerned that, at said shareholder meeting, the other two shareholders will remove Moores from his position of corporate control. In other words, GM has alleged that a shareholder fight has arisen among the principals of MV Pipeline, and GM wants the Court to step in to protect it and the minority shareholder. GM seeks the appointment of a trustee in order to quell the shareholders' meeting, and requests that the Court schedule an expedited hearing on the Motion prior to the close of business on Friday, May 27, 2005.

Order Denying Application for Expedited Hearing on Emergency Motion for Order Appointing Trustee and For Order Reducing Response Time to Shorten Notice ("Judge Michael's Order"), Movant Exhibit M, at 2. Judge Michael declined to set an emergency hearing to consider appointing a trustee to assume control MV Pipeline because (1) insufficient time existed to allow MV Pipeline and its shareholders adequate notice of the motion and an opportunity to respond or to prepare a defense; (2) GM Oil failed to allege improper conduct by MV Pipeline (which Judge Michael did not find surprising since MV Pipeline was managed and operated by GM Oil) or improper conduct by the majority shareholders; (3) the harm GM Oil alleged was speculative, and calling a shareholders meeting and ousting GM Oil as manager was the legal prerogative of shareholders, and thus the pendency of such a meeting did not constitute an emergency;[5] and (4) Judge Michael would not presume, prior to the expiration of the time allotted to the Alleged Debtor to answer the involuntary petition, that the petition stated a valid claim for the entry of an order for relief. Judge Michael's Order at 4-5. In the context of denying emergency relief, Judge Michael noted that "[t]he facts as alleged create a strong impression that this is a two-party fight between Moores and the other shareholders. It is well established that the use of an *involuntary bankruptcy filing* is an improper method for resolving a two-party dispute." Judge Michael's Order at 5 (emphasis added).[6] In his order, Judge Michael indicated that he

---

[5]Judge Michael also noted that the appointment of a trustee on behalf of MV Pipeline would not necessarily prevent the shareholders from acting at a duly convened shareholders meeting.

[6]In his testimony at the hearing on Movants' Motion to Dismiss, Moores admitted that he caused the Involuntary Case to be filed because he wanted to move the Pittsburg County Litigation to federal court and force MV Pipeline to pay the Petitioning Creditors' claims.

6

would consider the request for a trustee only after MV Pipeline had an opportunity to answer the involuntary petition, and that the hearing on the motion for trustee would be consolidated with the trial on the involuntary petition if the petition was contested. Id. at 6.

On or about May 30, 2005, the special meeting of MV Pipeline's shareholders was held. The majority shareholders chose directors, and the directors elected Harper as president and Stipe as vice president.[7] Moores was not elected to a board or executive position, but the shareholders did not seek to remove Moores or GM Oil as MV Pipeline's manager or operator at that time.

On June 15, 2005, MV Pipeline filed Debtor's Answer to Involuntary Petition (Movant Exhibit K). MV Pipeline alleged that it assumed that it was paying its debts as they became due and if it was not, it was the fault of the Petitioning Creditors who were in control of MV Pipeline, and further alleged that the debts of the Petitioning Creditors were contingent and subject to *bona fide* dispute. Id. at 1-2. MV Pipeline also alleged that the Involuntary Case was filed for an improper purpose, *i.e*., to prevent a lawful shareholders meeting from occurring which would result in Moores' removal from control. MV Pipeline requested dismissal of the Involuntary Case as well as an award of fees and costs incurred in defending against the involuntary petition. Id. at 2-3. MV Pipeline also filed Debtor's Response to Motion to Appoint Trustee (Movant Exhibit L), in which it contended that no grounds existed for the appointment of a trustee because the shareholders had elected new directors, the new directors had elected officers, and although Moores was no longer an officer or director, the new management would permit GM Oil to continue operating MV

[7]Currently, the board consists of Harper, Stipe, John Thetford and Ted Maxey.

7

Pipeline "to ensure no disruption of MV's business, until such time as new management can assess the operations of MV and how to proceed going forward." Id., ¶¶ 6, 7.

On June 22, 2005, Judge Michael conducted a telephonic status hearing, which was continued to July 18, 2005. Docket Sheet, Movant Exhibit C. The Minute of the July 18th continued status conference states that a motion to dismiss would be filed. Id.[8] On July 27, 2005, the Petitioning Creditors filed a motion to dismiss the Involuntary Case. The motion was not opposed, and on September 1, 2005, Judge Michael entered an order dismissing the Involuntary Case without a hearing. Id.

**Management and Operation of MV Pipeline by Moores**

Since at least 1997,[9] MV Pipeline's gas gathering system has been operated and managed by Moores acting on behalf of GM Oil. GM Oil's services include overseeing and performing field work, procuring, monitoring and maintaining equipment,[10] measuring

_____

[8]Transcripts of the status conferences were not introduced into evidence.

[9]Stipe, Harper and Moores purchased MV Pipeline in 1997. However, Moores/GM Oil operated the pipeline since approximately 1995.

[10]MV Pipeline's system gathers gas from low production, low pressure wells, necessitating the use of two compressors, the first to suck the gas out of the ground and the second to gradually pressurize the gas to create velocity to maintain the flow of the gas to the central purchasing point. Proper operation of the system requires extensive monitoring and maintenance of the compressors, as any interruption of the flow would result in not only a loss in revenue from the sale of gas, but also potential damage to the gas wells.

In 2006, MV Pipeline had "maxed out" the capacity its compressors could accommodate, and therefore Moores caused GM Oil to enter into contracts for the lease of two larger compressors for use by MV Pipeline, which increased MV Pipeline's annual operating expense by approximately $36,000. The system currently has the capacity to transport greater volumes of gas and is not operating near its capacity.

The compressor leases were executed by GM Oil because MV Pipeline did not have sufficient credit to qualify for the leases. GM Oil passes the lease expense through to MV Pipeline and does not profit from the leases.

production and sales, and providing bookkeeping, clerical and secretarial services. GM Oil also provides MV Pipeline the use of its office space, equipment and facilities. Thus, MV Pipeline does not own an office or employ any employees, but GM Oil and Moores have traditionally provided those facilities and services to MV Pipeline. GM Oil and Moores also advance funds for MV Pipeline's operations.

Moores served as president of MV Pipeline until Harper was elected president in May 2005. Moores, on behalf of GM Oil, also manages and operates the wells on the Crouch and Diamond leases.

Natural gas produced by the Crouch and Diamond leases is gathered by and transported through MV Pipeline's system.[11] MV Pipeline also transports natural gas from leases owned by Concorde (which is owned by Moores). In addition, MV Pipeline transports natural gas produced by Drake Exploration ("Drake") on one of its leases (the "Drake Lease"). Drake is owned and operated by Michael Flick. Neither Drake nor Mr. Flick is affiliated with MV Pipeline or any of its shareholders, and therefore Drake is considered a "third party" operator/producer. Currently, approximately ninety percent of the gas transported by MV Pipeline is produced by leases held by shareholders of MV Pipeline ("affiliated" producers), and approximately ten percent by a third party producer, Drake.

In January 2004, Moores executed a Management Agreement between MV Pipeline and GM Oil, for a term of five years, in which MV Pipeline promised to pay GM Oil $3,000

---

[11]It appears that Stipe, Harper and Moores originally purchased MV Pipeline for the purpose of transporting gas from their properties in which they held the working interests (the Crouch and Diamond wells) to market, and had agreed that the transportation fee charged to these properties would be favorable to Stipe, Harper and Moores.

9

per month "to reimburse GM for providing MV with management services and office space, facilities, equipment and supplies." Management Agreement, Movant Exhibit B, ¶ 5.[12] Moores executed the Management Agreement as president of MV Pipeline and as president of GM Oil.[13] Moores did not consult with Stipe or Harper regarding his intent to bind MV Pipeline to the terms of the Management Agreement.

In addition to delineating GM Oil's duties to MV Pipeline and MV Pipeline's obligation to pay GM Oil, the Management Agreement also purports to liquidate the amount of debt that Moores contends MV Pipeline owes Moores, GM Oil, Concorde, Stipe, and Harper in amounts set forth on Exhibit A to the agreement, and further provides that MV Pipeline will pay interest on that debt at a rate of eight percent, compounded quarterly, and commits MV Pipeline to pay the alleged debt "as quickly as possible or on demand." Id., ¶ 4. Exhibit A to the Management Agreement, which was prepared by Moores, asserts that MV Pipeline owes (1) Stipe $4,666; (2) Harper $4,866; (3) Moores $20,000; (4) Concorde $20,892.07; and (5) GM Oil $441,271.91. Id. MV Pipeline disputes the validity of the Management Agreement because Moores unilaterally, and without board or shareholder approval, committed MV Pipeline to a contract with an entity owned by Moores, and

---

[12]MV Pipeline does not contend that the $3,000 monthly fee is unreasonable. Further, MV Pipeline does not complain about GM Oil's field operation of the gas gathering system. MV Pipeline does object to management decisions made by Moores, however, including his decision to implement a discriminatory pricing structure which favors entities he owns or controls, and other alleged acts of self-dealing and usurpation of corporate opportunities.

[13] In the Pittsburg County Litigation, Moores/GM Oil could not establish entitlement to reimbursement from Stipe and Harper for certain services rendered to the joint ventures because the parties had no written agreement. Accordingly, Moores believed it prudent to enter into a written management agreement to establish GM Oil's right to compensation from MV Pipeline going forward.

attempted on behalf of MV Pipeline to liquidate debts purportedly owed to Moores and his affiliated entities, the liability of which the majority shareholders of MV Pipeline disputed at the time Moores executed the Management Agreement, and continue to dispute at this time.

On or about May 13, 2005, Moores executed, on behalf of MV Pipeline as Grantor, a Non-Exclusive Assignment of Rights-of-Way (MV Exhibit 16) (the "ROW Assignment"), purporting to assign to GM Oil a "non-exclusive use, right, privilege, authority and interest Grantor owns or holds in and to those particular Rights-of-Way Agreements and/or Utility Agreements set forth on Exhibit 'A' attached hereto and incorporated herein by reference and/or Rights-of-Way Agreements owned by M.V. Pipeline in McIntosh County, State of Oklahoma." Id. at 1. Exhibit A to the ROW Assignment lists ninety (90) individual right of way or utility agreements (by name of the grantor and book and page number) and also includes "all permits for crossing U.S. Corp. of Engineers Property, County Roads and State Highways." Id. GM Oil paid MV Pipeline $20,000 for the ROW Assignment. The ROW Assignment was recorded in the county land records. Moores did not consult with or seek the approval of Stipe or Harper prior to assigning these valuable rights possessed by MV Pipeline to GM Oil,[14] and Harper only learned of the assignment from a third party. Hypothetically, GM Oil could build a competing pipeline on the forty miles of contiguous rights of way originally acquired by MV Pipeline and on which the gas gathering system,

---

[14]Moores testified that in May 2005, MV Pipeline needed money to operate, and rather than request a capital infusion from Stipe and Harper, or borrow funds, he caused GM Oil to pay $20,000 to MV Pipeline and caused MV Pipeline to execute the ROW Assignment in favor of GM Oil.

11

which is MV Pipeline's principal asset, is situated.[15]  Harper testified that he would not have

approved the ROW Assignment to GM Oil on any basis or for any price.  As evidence of the

value of MV Pipeline's forty mile easement, MV Pipeline produced evidence that in March

2007, MV Pipeline acquired a *one mile* right of way in the area for approximately $18,950.

Operating Statement dated March 27, 2007, MV Exhibit 8, at MV 007135; Receipt, MV

Exhibit 20.[16]  In addition, Alan Staub, who had constructed and operated several gas

gathering systems, testified that rights of way generally cost $10-15,000 per mile.

In 2000, Moores, on behalf of MV Pipeline, made an offer to purchase a gas

gathering system south of MV Pipeline's system (the "Brookings System") for $250,000,

which offer was rejected by the seller.  Sometime thereafter, Moores personally acquired the

Brookings System for $230,000.  The shareholders of MV Pipeline believe Moores had an

obligation to advise MV Pipeline of the opportunity to expand its reach into the Brookings

System territory before Moores purchased the potentially competing system.

On March 7, 2006, MV Pipeline, through counsel, wrote a letter to counsel for

Moores/GM Oil, advising that Harper and Stipe, as directors of MV Pipeline, had decided

---

[15]Indeed, in his testimony, Moores stated that if MV Pipeline removes GM Oil as its operator, or if MV Pipeline increased the transportation fee to GM Oil, he intended to build his own competing gas gathering system to transport gas from wells GM Oil operates, including, arguably, the Crouch and Diamond properties as well as properties leased and operated by Concorde, which constitute approximately ninety percent of the production serviced by MV Pipeline.

[16]The one-mile right of way was purchased to connect new three wells operated by GM Oil or Concorde.  Because under Moores' management, MV Pipeline charges a minimal fee to affiliated operator/producers, and apparently does not collect right of way or pipeline costs from its affiliated producers, connection of additional affiliated wells may result in a windfall to the affiliated operator and a detriment to MV Pipeline.

Case 07-80214    Doc 79    Filed 05/15/07    Entered 05/15/07 17:15:52    Desc Main
Document    Page 12 of 33

to change management of MV Pipeline, and demanding all of MV Pipeline's property and books and records, including contracts, manuals, inventories, accounting and banking records, tax returns, insurance policies, titles, reports, maps and plans, as well as inventory and equipment owned by MV Pipeline. Letter dated March 7, 2006, MV Exhibit 21 (the "March 7th Letter"). The letter advised that MV Pipeline had employed or appointed Sid Risner to take possession of MV Pipeline's property and documents on March 13, 2006. Id.

Moores responded that he did not intend to turn over the books and records, or other property of MV Pipeline to Harper and Stipe until MV Pipeline paid Moores and GM Oil the debts purportedly liquidated in the Management Agreement. In his testimony, Moores also refused to recognize that Harper was the president of MV Pipeline.

### McIntosh County Litigation

On March 10, 2006, GM Oil and Moores filed a petition against MV Pipeline in the District Court for McIntosh County, Oklahoma, Case No. 2006-77, which petition was amended on April 4, 2006 (the "McIntosh County Litigation"). Docket Sheet, Movant Exhibit E; Petition, MV Exhibit 24; Amended Petition, Movant Exhibit G. In the Amended Petition, Moores and GM Oil allege that (1) MV Pipeline owes Moores $20,000 for operating expenses, as set forth in the Management Agreement; (2) MV Pipeline owes GM Oil $441,271.91 for operating expenses and debt service, as set forth in the Management Agreement; (3) MV Pipeline owes GM Oil $78,000 for management services provided under the Management Agreement; (4) GM Oil has a lien on all personal property of MV Pipeline; and (5) by virtue of the March 7th Letter, MV Pipeline has indicated its intent to breach the Management Agreement. Amended Petition, Movant Exhibit G. Moores seeks a judgment

Case 07-80214    Doc 79    Filed 05/15/07    Entered 05/15/07 17:15:52    Desc Main
Document    Page 13 of 33

in the amount of the alleged debt owed by MV Pipeline, and GM Oil seeks a judgment in the amount of the alleged debt and foreclosure of the alleged lien, and further seeks to enjoin the alleged threatened breach of the Management Agreement, or in the alternative, damages for breach of the Management Agreement. Id.

On March 14, 2006, MV Pipeline, Harper, and Stipe filed a competing petition against Moores, GM Oil and Concorde in Pittsburg County ("Case No. 2006-242"), which was amended on April 19, 2006. Docket Sheet, Movant Exhibit F. In their amended petition, MV Pipeline, Harper and Stipe allege that (1) Concorde falsely claimed ownership of MV Pipeline; (2) Moores and GM Oil refuse to execute an assignment of one of the former joint venture properties to Stipe and Harper as required by orders entered in the Pittsburg County Litigation; (3) Moores and GM Oil, as operator, refuse to provide Stipe and Harper with operating agreements, division orders, and other documentation, or an accounting of revenues and expenses with respect to the former joint venture properties; (4) Moores and GM Oil acted without authority and engaged in self-dealing in causing MV Pipeline to enter into the Management Agreement, and in causing MV Pipeline to execute the ROW Assignment in favor of GM Oil; (5) the debts purportedly established in the Management Agreement are not legitimate debts of MV Pipeline; and (6) Moores and GM Oil refuse to turn over MV Pipeline's property and books and records, and refuse to recognize the authority of Harper and Stipe, as officers of MV Pipeline, to manage the company. Plaintiff's [sic] First Amended Petition, MV Exhibit 25. MV Pipeline seeks (1) a mandatory injunction requiring Moores and GM Oil to turn over MV Pipeline's property and books and records, and enjoining Moores and GM Oil from attempting to control the business affairs

14

of MV Pipeline; (2) a declaration that MV Pipeline is not indebted to Moores, GM Oil or Concorde; (3) damages against Moores for alleged breaches of fiduciary duties; (4) vacation of the ROW Assignment; (5) an accounting of MV Pipeline's financial affairs from Moores and GM Oil; (6) rescission of the Management Agreement and any other contracts between MV Pipeline and Moores or entities controlled by Moores; (7) disgorgement by Moores, GM Oil and Concorde of any payments received from MV Pipeline; and (8) a declaration that Concorde had no right, title or interest in MV Pipeline or any of its assets.  Id.

In the amended petition, Stipe and Harper individually seek (1) enforcement of the orders entered in the Pittsburg County Litigation with respect to the assignment of the former joint venture property, and to hold Moores and GM Oil in contempt; (2) a mandatory injunction requiring Moores and GM Oil to provide documentation concerning properties owned by Stipe and Harper that are operated by Moores and GM Oil; (3) an accounting with respect to their interests in the former joint venture properties; and (4) damages against Moores and GM Oil for breach of duties as operator.  Id.  MV Pipeline, Stipe and Harper also filed a motion for temporary injunction seeking to enjoin Moores and GM Oil from attempting to manage, operate or control MV Pipeline or its assets, and to command Moores and GM Oil to turn over MV Pipeline's property, books and records.  Plaintiffs' Motion for Temporary Injunction and Brief in Support, Movant Exhibit I.  A hearing was set to consider the request for temporary injunction, which was continued several times by agreement of the parties.  Docket Sheet, Movant Exhibit F.

Moores and GM Oil filed a motion to transfer Pittsburg County Case No. 2006-242 to McIntosh County, and MV Pipeline filed a motion to transfer the McIntosh County

15

Litigation to Pittsburg County. Docket Sheet, Movant Exhibit E. On October 24, 2006, the Pittsburg County court entered an order transferring Case No. 2006-242 to McIntosh County, where Case No. 2006-242 was consolidated with the McIntosh County Litigation. Id. MV Pipeline's request for injunctive relief was set to be heard in McIntosh County on December 22, 2006, but the hearing was continued at the request of MV Pipeline, to be reset upon application. Order, Movant Exhibit J.

Although the McIntosh County Litigation has been pending for over a year, no issues of substance have been decided by the McIntosh County court. Discovery was deferred, only one deposition has been taken, the issues are not ripe for decision, and no trial date has been set. MV Pipeline has not requested that the request for injunctive relief be reset in the McIntosh County Litigation.

**MV Pipeline's Voluntary Chapter 11**

At the time the Voluntary Chapter 11 Petition on behalf of MV Pipeline was filed, Moores was in possession and control of the company's books and records and refused to turn them over to MV Pipeline's president, Harper, or his agents. Harper helped prepare and signed, under penalty of perjury, the List of Creditors Holding 20 Largest Unsecured Claims ("List of 20 Largest"). The list includes Moores, GM Oil, Concorde, Stipe, and Harper, all in unknown amounts, as well as possible trade creditors and taxing authorities. List of 20 Largest, Movant Exhibit N. Although Moores contends that the list is false and that certain parties identified on the list are not creditors of MV Pipeline, the Court finds that due to Moores refusal to surrender MV Pipeline's books and records, Harper's effort to complete the List of 20 Largest was in good faith, and that the list was "true and correct to the best of

16

[his] information and belief." Id. The list served to provide notice of the bankruptcy filing to persons Harper had ample reason to believe had claims against MV Pipeline, such as Moores, GM Oil and Concorde, who have collectively sued MV Pipeline for an amount in excess of $500,000, as well as those who *might* have claims. The over-inclusive list did not result in prejudice to anyone.

On March 8, 2007, MV Pipeline filed a Motion to Reject Executory Contract with GM Oil Properties, Inc. ("Rejection Motion") (Movant Exhibit O), a Motion to Incur Debt to Continue the Operation of Business and Re-capitalize the Company ("Financing Motion") (Movant Exhibit Q), and a Motion for Turnover of Property of the Bankruptcy Estate, Including Books and Records of MV Pipeline Company ("Turnover Motion") (Movant Exhibit P). In the Rejection Motion, MV Pipeline seeks to reject the Management Agreement with GM Oil pursuant to 11 U.S.C. § 365(a). In the Financing Motion, MV Pipeline seeks authorization, pursuant to 11 U.S.C. § 364(b), to incur unsecured debt of up to $50,000, to be funded by Stipe and Harper, and to allow the same as an administrative expense priority claim. In the Turnover Motion, MV Pipeline requested an order requiring Moores and GM Oil to turnover, pursuant to 11 U.S.C. § 542, all tangible and intangible property of the bankruptcy estate, including books and records. At a conference held prior to the hearing on the Motion to Dismiss, the Court ordered Moores and GM Oil to make MV Pipeline's books and records available to MV Pipeline's representatives and counsel for review and copying. The parties complied, and MV Pipeline now has copies of its books and records, and therefore MV Pipeline has withdrawn its Turnover Motion without prejudice to refiling if property of the estate is not voluntarily turned over to MV Pipeline.

**MV Pipeline's Financial Condition and Plan for Reorganization**

MV Pipeline's tax returns indicate the following:

| Year | Gross receipts | COGS | Income | Taxable income |
|------|----------------|------|--------|----------------|
| 2001 | $ 278,042.00 | $ 255,265.00 | $ 22,777.00 | $ -50,637.00 |
| 2002 | 221,871.00 | 197,914.00 | 23,212.00 | -13,154.00 |
| 2003 | 263,000.00 | 204,499.00 | 58,501.00 | 37,472.00 |
| 2004 | 216,819.00 | 195,847.00 | 20,972.00 | -10,154.00 |
| 2005 | 177,071.00 | 195,885.00 | 3,095.00[17] | -18,003.00 |

MV Pipeline has not yet filed a tax return for 2006, but the company's bookkeeping records indicate that as of December 27, 2006, the company incurred a year-to-date loss in the amount of $94,747.84 on gross receipts of $211,131.41. MV Pipeline 2006 Monthly Reports, MV Exhibit 7, at MV000088.

MV Pipeline has never paid any dividends to its shareholders.

MV Pipeline's primary source of revenue is fees (or "tariffs") charged for the transportation of natural gas. Under Moores' management, MV Pipeline has charged $.45 to $.70 per MCF for transportation of gas produced by the Diamond and Crouch Leases, which are owned by Stipe, Harper and Moores/GM Oil, and which are operated by GM Oil,[18] but it charges third party operator/producers, such as Drake, approximately 30% of the sales

---

[17]The 2005 tax return reflects income from a source other than gross receipts in the amount of $20,000, which was for the sale of business property, namely, the ROW Assignment to GM Oil.

[18]There are no written contracts governing MV Pipeline's transportation of gas produced by the Crouch and Diamond Leases.

18

price obtained from a purchaser for Drake's gas production.[19] Gas Purchase Contract Between Drake Exploration Inc. and MV Pipeline Company dated June 2, 1997 ("Drake Contract"), MV Exhibit 10, at 12.

MV Pipeline also transports gas produced on leases owned by Vega Energy Company ("Vega"), a third party producer which is now owned by Concorde. Under a written agreement dated July 1, 1997, which had a term of ten years, MV Pipeline charged Vega a tariff of approximately 30% of the sales price obtained from the sale of Vega's gas. Gas Purchase Contract Between Vega Energy Company and MV Pipeline Company dated July 1, 1997 ("Vega Contract"), MV Exhibit 11, at 12. Sometime after Concorde (which is owned by Moores) purchased Vega, MV Pipeline (under Moores' management) began charging Concorde $.70 per MCF rather than 30% of the gas sales price. January 2007 Sales Disbursed March 2007, MV Exhibit 9, at MV006251. Moores testified that MV Pipeline (under Moores' management) and Vega (which is owned by Concorde, which is owned by Moores) "mutually agreed" to terminate the Vega Contract before its term expired and reduced the tariff charged to Concorde to $.70 per MCF. Moores testified that he did this to give Concorde "the incentive" to drill more wells and put more wells on the system.

Moores did not offer the same concession to Drake, however. In correspondence and in person, Mr. Flick, on behalf of Drake, often requested that he and Moores, on behalf of

---

[19]This arrangement is termed a "70/30" contract. Generally, MV Pipeline takes possession of the natural gas at the wellhead, uses some of the gas to fuel its equipment (compressors, etc.), and sells the remaining gas to a purchaser (currently, Clearwater Enterprises). Under a 70/30 contract, the producer is entitled to 70% of the sales price (a "70% payout") and MV Pipeline retains 30% as its tariff. If the producer's volume exceeds a certain MCF level, however, the producer is entitled to 80% payout, and MV Pipeline would receive 20% for transporting the gas.

19

MV Pipeline, negotiate a more favorable tariff. Mr. Flick indicated that he would have an economic incentive to drill or rework wells and increase gas production (thus increase the volume MV Pipeline would be paid to transport) only if his tariff was lower, for example, 20%, and further stated that potential partners lost interest in contributing capital due to the 70/30 contract. Letter dated April 19, 2001, Movant Exhibit T, and Letter dated January 2, 2002, Movant Exhibit U. Specifically, Mr. Flick stated: "It would seem to me that as the gas gatherer it would be in your interest to afford me a better payout to encourage and augment production increases from a hard-charger producer like myself. . . . I see it as a win-win situation for use both." Letter dated January 2, 2002. Moores refused to renegotiate the Drake Contract, and therefore Drake was not able to take advantage of additional development opportunities which might have provided additional volume, and thus revenue, to MV Pipeline. Mr. Flick testified that if MV Pipeline, under new management, offered Drake an 80/20 contract, he would drill four new wells. Mr. Flick testified that he has had a consistently negative experience in dealing with MV Pipeline, as managed by Moores, and that Moores' refusal to negotiate a more favorable transportation fee precluded Drake and operators from developing leases in MV Pipeline's territory.

Tim Elias, on behalf of Enterprise Energy Exploration, Inc. ("Enterprise"), and a partner (Austex), acquired leases on 16,000 acres in McIntosh County (approximately 44 square miles), and in 2004 drilled four gas wells in an area approximately one mile from the MV Pipeline system. Early in 2004, each of the four wells produced between 20-30 MCF per day (80-120 MCF total), which increased to 70-80 MCF per well per day (280-360 MCF) over a five month period. Elias contacted Moores about connecting gas wells to the MV

20

Pipeline system. As a condition to agreeing to connect the Enterprise wells to the MV Pipeline system, Moores required Enterprise to dedicate all 16,000 acres to the system, which was not feasible because portions of the acreage lay up to ten miles from the established pipeline. Moores also demanded an override interest in the Enterprise wells as a condition to connecting the wells to the MV Pipeline system. Elias proposed to dedicate two sections (1,280 acres), but Moores rejected that offer. Enterprise offered to bear the cost of acquiring the rights of way and the cost of laying the pipeline from MV Pipeline's system to the Enterprise wells. Moores refused to enter into an agreement with Enterprise unless the two unreasonable conditions were met. In 2004, Enterprise was forced to shut in the wells, and in 2005, Enterprise sold its interest in the 16,000 acres to its partner, Austex. The wells remain shut in because there is no alternative to the MV Pipeline system in the area to transport the gas to a purchaser.

In January 2007, when MV Pipeline sold Drake's and Vega's gas for approximately $5.80 per MCF, it appears that Drake retained $3.96 per MCF and paid MV Pipeline a tariff of $1.84 per MCF, while Vega/Concorde and GM Oil retained $5.10 per MCF and paid MV Pipeline $.70 per MCF for the same transportation service. January 2007 Sales Disbursed March 2007, MV Exhibit 9, at MV006251. If MV Pipeline were to charge affiliated operator/producers (*i.e.*, Vega/Concorde and GM Oil) the same rate it charges the third party producer (that is, 30%), MV Pipeline could more than double its revenue. If MV Pipeline enters into 80/20 contracts with affiliated producers and third party producers, assuming that

Case 07-80214   Doc 79   Filed 05/15/07   Entered 05/15/07 17:15:52   Desc Main
Document   Page 21 of 33

the price of natural gas is $5.80 per MCF,[20] all users would pay a fee of $1.16 per MCF, which would result in an additional $.46 per MCF from affiliated producers who currently contribute ninety percent of the MV Pipeline's volume. Further, if MV Pipeline entered into 85/15 contracts with all operator/producers, again assuming a price of $5.80 per MCF, MV Pipeline would earn a transportation fee of $.87 per MCF, an increase of $.17 per MCF from the fee currently paid by affiliated producers.

Alan Staub, who constructed and operated six or seven gas gathering systems in Oklahoma over the last fifteen years, and who is familiar with MV Pipeline's system, testified that it was common in the industry to charge 15-20% of the gas sales price as a transportation fee with the percentage dependant upon the volume of each well, with lower volumes demanding a higher percentage, and with greater volumes allowing for a lower percentage or a percentage with a cap of $.80-90. He opined that gas gathering systems should be able to charge a reasonable fee and make a profit, and that it would be "unexpected" to operate a gas gathering system at a loss. He stated that in MV Pipeline's case, because the average per well volume was marginal, a 20% fee with a minimum fixed fee of $100.00 to $150.00 per month would be reasonable. He also believed MV Pipeline's facilities and compressors could accommodate two or three times the volume of gas currently transported. He testified that it would have been advantageous to MV Pipeline to extend the pipeline to connect the four Enterprise wells, because they would have added at least 200

---

[20]The Court finds that $5.80 MCF is a relatively modest gas price to use in the above example. The eighteen month average ONG Index Price from November 2005 to April 2007 was $6.56 MCF, with a low of $3.52 MCF (in October 2006) and a high of $10.80 MCF (in November 2005).

Case 07-80214   Doc 79   Filed 05/15/07   Entered 05/15/07 17:15:52   Desc Main
Document   Page 22 of 33

MCF a day to the system and would have encouraged additional exploration and development on the 16,000 acre leasehold. He also stated that MV Pipeline's continuing reluctance to connect the Enterprise wells and other third party wells to the system might provide an incentive for someone to develop a competing gas gathering system in the area.

Sid Risner, a petroleum engineer with extensive experience in the oil and gas industry in Oklahoma, has evaluated the reserves in the area in which MV Pipeline operates for over 20 years, is familiar with the potential for production in the area, and is generally familiar with the MV Pipeline system. At one time, he owned a company that held interests in the 16 Diamond wells that are connected to the MV Pipeline system. Mr. Risner testified that the MV Pipeline system could service four townships–144 square miles–including the area in which the former Enterprise leases are situated. Currently, MV Pipeline services only 14 sections (about 10 percent) of that area. Mr. Risner considered the former Enterprise wells very important harbingers of the area's potential, and believed that those wells could be easily connected to MV Pipeline's system. In his opinion, the acreage within MV Pipeline's service area, including the former Enterprise acreage, possesses tremendous potential to produce gas from previously untapped shallow formations and coal formations due to the availability of new and inexpensive drilling technology. Third party operator/producers have ceased exploration in the area because MV Pipeline's system is the only pipeline available to transport gas to market, and MV Pipeline, as managed by Moores, has not been willing to accommodate third party producers. Mr. Risner also testified that if MV Pipeline had 85/15 contracts with its current customers, MV Pipeline would generate sufficient revenue to cover its costs and turn a profit.

As president of MV Pipeline and the responsible person for MV Pipeline as debtor-in-possession, Harper testified that he intended to remove Moores as manager of MV Pipeline and seek reversal of transactions that were the result of self-dealing,[21] and to employ Sid Risner to evaluate the management and operations of the system and make recommendations to the board with respect to developing a stand-alone viable, profitable, gas gathering system. Mr. Risner is willing to operate the gas gathering system if Moores is removed or resigns as operator.[22] Harper and Stipe have offered to loan MV Pipeline up to $50,000 to finance the reorganization.

## III.    Conclusions of law

Movants contend that MV Pipeline filed its Chapter 11 petition solely as a litigation tactic to gain an advantage in the disputes between Movants on one hand and Stipe, Harper and MV Pipeline on the other, pending in the McIntosh County Litigation and in the Pittsburg County Litigation, and therefore the petition was filed in bad faith.  Accordingly, Movants believe "cause" exists for dismissal of this Chapter 11 case.

Section 1112 governs conversion and dismissal of Chapter 11 cases, and provides as follows–

> (b)(1) Except as provided in paragraph (2) of this subsection, . . . on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and

---

[21]Harper did not rule out retaining Moores/GM Oil as operator of the system, however.

[22]Mr. Risner is prepared to comply with all testing, safety and reporting requirements of a gas gathering system operator set by the Oklahoma Corporation Commission.  He would contract out accounting and field work, but would endeavor to retain as many current field personnel as possible.

the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *if the movant establishes cause*.

(2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that–

    (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

    (B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)–

        (i) for which there exists a reasonable justification for the act or omission; and

        (ii) that will be cured within a reasonable period of time fixed by the court.

(3) The court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

(4) For purposes of this subsection, the term 'cause' includes–

    (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

    (B) gross mismanagement of the estate;

    (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

    (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

    (E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b) (emphasis added).

Thus, the Movants have the burden of establishing "cause" for dismissal. Id., § 1112(b)(1). If Movants establish "cause," MV Pipeline may avert dismissal by proving "unusual circumstances" that would render dismissal "not in the best interests of creditors

and the estate," (§ 1112(b)(1)), or show that there is a reasonable probability that MV Pipeline can confirm a plan within a reasonable period of time and that any act or omission found to constitute "cause" was reasonably justified (other than substantial or continuing losses to the estate and absence of a substantial probability of rehabilitation) and may be cured in a reasonable amount of time (§ 1112(b)(2)). The Court concludes that Movants failed to establish any of the situations constituting "cause" that are specifically enumerated in Section 1112(b)(4).

Section 1112(b)(4) is not an exclusive list of all conditions that might constitute cause for dismissal of a Chapter 11 case, however. A Chapter 11 case may be dismissed if it was filed in bad faith. See In re Muskogee Environmental Conservation Co., 236 B.R. 57, 66 (Bankr. N.D. Okla. 1999) (and cases cited therein). Various courts have concluded that filing Chapter 11 solely to frustrate or delay a secured creditor's right to foreclose on the debtor's single real estate asset constitutes a bad faith filing. See, e.g., Udall v. FDIC (In re Nursery Land Development, Inc.), 91 F.3d 1414 (10th Cir. 1996); Laguna Associates Ltd. Partnership v. Aetna Cas. & Sur. Co. (In re Laguna Associates Ltd. Partnership), 30 F.3d 734 (6th Cir. 1994); In re Springs Hospitality, Inc., 2006 WL 2458679 (Bankr. D. Colo.). Movants argue that while MV Pipeline has more than one asset, its principal asset is the pipeline and rights of way on which it is located, which renders this case analogous to a single asset real estate case, particularly the Springs Hospitality case. However, even if it were true that MV Pipeline owns a single real estate asset, in this case, no secured creditor is attempting to foreclose on the single asset, and the bankruptcy was not commenced to forestall or frustrate an inevitable foreclosure.

Case 07-80214   Doc 79   Filed 05/15/07   Entered 05/15/07 17:15:52   Desc Main
Document    Page 27 of 33

Other indicia of a bad faith Chapter 11 filing distilled from the case law include (1) improper pre-petition conduct of the debtor; (2) a paucity of unsecured creditors and debts; (3) the existence of a "standstill in state court litigation" between the debtor and a creditor, or a judgment against the debtor for which the debtor cannot afford to post bond; (4) filing bankruptcy to avoid complying with court orders; (5) the debtor is a mere shell with no ongoing business or employees; and (6) there is no possibility of reorganization. See Laguna, 30 F.3d at 738. Movants point to several of these factors as indicia of bad faith in this case.

Movants contend that other than insiders (Moores, GM Oil, Concorde, Stipe and Harper), MV Pipeline has no unsecured creditors (other than trade creditors whose accounts are not in default). The fact that the debtor's significant creditors are insiders does not mean that the debtor should not be able to utilize Chapter 11 to liquidate the amount of insiders' claims or to propose a structure to pay the debts in a fair and orderly fashion, however. See, e.g., In re Walden Ridge Development, LLC, 292 B.R. 58, 64 (Bankr. D. N.J. 2003). Moreover, MV Pipeline operates at a loss, so Moores' and GM Oil's alleged claim for management fees is increasing on a monthly basis. Because MV Pipeline is and has been insolvent, Moores caused MV Pipeline to execute the ROW Assignment to GM Oil to raise $20,000 for MV Pipeline's operations. MV Pipeline is not one of those thriving businesses that invokes bankruptcy to thwart a single disfavored creditor.

Movants also argue that MV Pipeline does not have any employees, as its operations are performed by employees of GM Oil. The Court does not assign any weight to the fact that MV Pipeline has contracted its operations to GM Oil rather than employing its own staff.

28

A debtor's lack of employees is an indication of bad faith only if the debtor has no ongoing business; when the debtor is an operating entity, whether its business tasks are performed by an independent contractor or employees is irrelevant.

Movants also contend that MV Pipeline has filed Chapter 11 in order to shift venue of the McIntosh County Litigation to this Court. Courts have held that a debtor who files solely to move a two-party dispute from one forum to another forum, where no legitimate bankruptcy purpose may be served by allowing the case to proceed, has filed the case in bad faith and therefore is not entitled to the protections of Chapter 11. See Muskogee Environmental, 236 B.R. at 66. Movants rely heavily on Muskogee Environmental case in arguing that MV Pipeline filed its Chapter 11 petition in bad faith. The facts in Muskogee Environmental are distinguishable from this case, however. In Muskogee Environmental, the operating debtor was a *profitable* business (it had accumulated $1.4 million in cash during the bankruptcy case itself), it had only a single substantial asset, and it had a few unsecured creditors, two of whom were prevailing parties in protracted litigation in state court. Id. at 64. The case was commenced to stay the judgment creditors' garnishments against the operating debtor and its principal. Id. at 62. Rather than file a *supersedeas* bond, the operating debtor and its principal filed petitions for relief under Chapter 11. Id. After the bankruptcy case was commenced, the state appellate court vacated the unfavorable judgment against the debtors and remanded the matter for retrial. Id. at 68. The bankruptcy court stated: "[T]he nucleus of this case is a classic two-party dispute between the Debtors on the one side and [two creditors] on the other side. The dispute is based exclusively on state law. The litigation in the State Court resulted in a judgment unfavorable to [the

29

Debtors], and taxed their resources. None of the litigation issues currently before this Court could not be resolved by the State Court." Id. at 66. The court further concluded: "The question presented by these cases is a simple one. It is whether Chapter 11 of the United States Bankruptcy Code exists for the purpose of allowing a debtor the option of litigating a dispute with a single party . . . in an alternate forum, when the debtor has no other need of or use for the bankruptcy court. The Court answers the question in the negative." Id. at 68. In that case, the unique powers and efficiencies of the bankruptcy process were not needed or invoked for the purpose of rehabilitating a faltering debtor. The debtors merely desired to substitute the bankruptcy court for the state court for the purpose of battling the claims that were the subject of the pre-petition state court proceedings.

The Movants have not established that MV Pipeline has invoked the jurisdiction of this Court solely as a litigation tactic for the purpose of changing the venue of or obtaining an advantage in the on-going dispute between Movants on one hand and Harper and Stipe on the other.[23] Rather, the Court finds that MV Pipeline is in financial distress, has been

---

[23]The fact that in the Involuntary Case, Judge Michael refused to grant the Movants emergency relief in the form of an injunction and appointment of a trustee in part because "[t]he facts as alleged create a strong impression that this is a two-party fight between Moores and the other shareholders" is neither binding nor relevant in this proceeding. Judge Michael's Order at 5. In dicta, Judge Michael stated that "[i]t is well established that the use of an *involuntary bankruptcy filing* is an improper method for resolving a two-party dispute." Id. (emphasis added).

In contrast, MV Pipeline has *voluntarily* sought the protection and benefits provided by the Bankruptcy Code in order to reorganize its financial affairs, which admittedly, includes resolving issues raised in the McIntosh County Litigation (such as obtaining books and records, and avoiding or rejecting contracts and conveyances between MV Pipeline and Moores/GM Oil). However, although some aspects of the relief sought by MV Pipeline in this Chapter 11 proceeding could be obtained in the McIntosh County Litigation, the pendency of those proceedings does not *ipso facto* establish a bad faith motive for filing Chapter 11. See, e.g., In re Walden Ridge Development, LLC, 292 B.R. 58, 62 (Bankr. N.J. 2003).

operating at a loss, yet owns established assets that have substantial economic value and which have not been fully developed or exploited under its current management. During his tenure as manager/operator of MV Pipeline, Moores has provided to properties he owns or controls (including properties owned jointly with Stipe and Harper) a low cost vehicle for transporting natural gas produced, but he failed to identify and develop additional customers for MV Pipeline's services and failed to attend to MV Pipeline's financial viability. In fact, it appears that Moores used MV Pipeline to actively discourage third party producers from developing in the area in which he owns and operates leases, to his benefit and to the detriment of MV Pipeline. Additionally, Moores committed MV Pipeline to the Management Agreement which purported to liquidate disputed debts in his and GM Oil's favor, and caused MV Pipeline to convey the ROW Assignment to GM Oil. Both transactions were executed surreptitiously by Moores while he was burdened by clear conflicts of interest. Further, rather than cooperating with MV Pipeline's majority shareholders or recognizing the legitimacy of their control of MV Pipeline, Moores filed a lawsuit to prevent duly elected officers from accessing MV Pipeline's books and records, and successfully frustrated MV Pipeline's efforts to reorganize its financial affairs outside of Chapter 11. Accordingly, the Court concludes that MV Pipeline's use of the bankruptcy process to assume control, management and preservation of its assets does not indicate bad faith.[24]

---

[24]The Court also finds distinguishable the additional cases the Movants submitted to the Court at the hearing. In the case of <u>In re Noco, Inc.</u>, 76 B.R. 839 (Bankr. N.D. Fla. 1987), the debtor had operated a successful franchise. Prior to the bankruptcy, the debtor's principals had transferred all the debtor's operating assets to another entity (also wholly owned by the debtor's principals) and began operating the same business under another name. Solely in order to reject the non-compete covenant contained in the debtor's contract

Case 07-80214   Doc 79   Filed 05/15/07   Entered 05/15/07 17:15:52   Desc Main
Document   Page 31 of 33

The Court further concludes that MV Pipeline has established, through the testimony of several witnesses with expertise in the oil and gas industry, that if it were properly managed as a for-profit enterprise, rather than as a private "perk" for its shareholders, it is reasonably foreseeable that MV Pipeline could formulate a business strategy and a fair price structure that provides incentives for further development by affiliated and third party producers, which could increase the volume of gas transported and thus MV Pipeline's revenue stream. Encouraging the use of MV Pipeline by third party producers would serve the larger community as well.

The Court concludes that MV Pipeline has identified certain obstacles to its solvency and has articulated reasonably achievable financial goals that would allow it to continue operating for the benefit of its current and future customers, its creditors and, eventually, its shareholders. To achieve these legitimate ends, MV Pipeline is entitled to take advantage

---

with the franchisor, the debtor's principals caused the debtor to file Chapter 11. The Court dismissed the Chapter 11 as having been filed in bad faith. The debtor was no longer an operating entity and therefore had no need to reorganize its affairs. In addition, the Court found that the debtor fraudulently transferred its assets, failed to disclose the transfers on its schedules, omitted income from its schedules, and paid all claims but the franchisor's claim. The circumstances leading to the dismissal of the Noco case are not present in this case.

The Court has also reviewed In Re Heritage Wood 'N Lakes Estates, Inc., 73 B.R. 511 (Bankr. M.D. Fla. 1987), tendered by Movants. In that case, the debtor filed bankruptcy to forestall a secured creditor from foreclosing on the debtor's sole real estate asset. In the foreclosure action, the debtor claimed that usury and perhaps some sort of lender liability excused the debtor from the debt (the facts are not well developed in the opinion). The debtor had no unsecured creditors. The bankruptcy court believed that the debtor engaged in forum shopping and held that the state court was better equipped to resolve the issues of state law between the debtor and its secured creditor. Again, MV Pipeline operates a gas gathering system business which is in financial distress and which could benefit from the Chapter 11 reorganization process; it is not attempting to thwart foreclosure of a single real estate asset by a secured creditor.

32

of the powers of and live under the obligations conferred by Chapter 11 of the Bankruptcy Code.

**IV. Conclusion**

Pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure, the Court enters these findings of fact and conclusions of law as the factual and legal bases for the Order Denying Motion to Dismiss issued on May 7, 2007.

**SO ORDERED** this 15th day of May, 2007.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

Case 07-80214    Doc 79    Filed 05/15/07    Entered 05/15/07 17:15:52    Desc Main
Document    Page 33 of 33